<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


GREG MANNING AUCTIONS, INC.,  :

        Plaintiff,  :

                       Civil Action No. 04-2076(JWB)

        v.  :

CARLTON J. FULMER,  :
MATTHEW BENNETT, INC.,
HARVEY BENNETT,  :
PAULA BENNETT and
JOHN DOES 1-10,  :

        Defendants.  :

**O P I N I O N**


**APPEARANCES**:

      MANDELBAUM, SALSBURG, GOLD, LAZRIS,
       DISCENZA & STEINBERG
      By:  Yale I. Lazris, Esquire
         Arla D. Cahill, Esquire
      155 Prospect Avenue
      West Orange, New Jersey 07052
      (Attorneys for Plaintiff)

      LAURENCE J. SASS, ESQUIRE
      443 Northfield Avenue
      West Orange, New Jersey 07052

           - and -

      ROBERT A. SCHNEIDER, ESQUIRE
      301 East 48th Street
      New York, New York  10017
      (Attorney for Defendants)

**BISSELL,** <u>Chief Judge</u>

    This matter comes before the Court on Defendants Carlton J.

Fulmer ("Fulmer"), Matthew Bennett, Inc. ("MBI"), Harvey Bennett

and Paula Bennett ("the Bennetts") (collectively "Defendants")
motion to dismiss Greg Manning Auctions, Inc.'s ("Plaintiff" or
"GMA") complaint for improper venue and lack of personal
jurisdiction or alternatively, to transfer this matter to the
District of Maryland.  This Court has jurisdiction over this
matter under 28 U.S.C. §§ 1331, 1332[1], 1367 and 18 U.S.C. §
1964(c).  For the reasons set forth below, venue in the District
of New Jersey is proper and Defendants' motion to dismiss the
complaint for improper venue and lack of jurisdiction or
alternatively, to transfer venue to the District of Maryland
pursuant to 28 U.S.C. § 1404(a) is DENIED.

### FACTUAL BACKGROUND

**I.   Parties**

     Plaintiff GMA is a Delaware corporation with its principal
offices located in West Caldwell, New Jersey.  (Compl., ¶ 1.)

     Defendant MBI is a corporation with its principal place of
business in Baltimore, Maryland.  (Id., ¶ 3.)

     Defendant Carlton J. Fulmer was an employee of plaintiff GMA

---

[1]     The Court acknowledges that Defendants assert, as an
alternative argument, that this Court may lack diversity
jurisdiction because the amount in controversy is below the
requisite $75,000.00.  In order to analyze this argument,
however, the Court would first need to determine whether
Plaintiff's customer list is a trade secret, which it claims is
its most valuable asset worth in excess of $2,000,000.00.  The
parties did not focus upon this issue in their briefs; therefore,
the Court will not address it at this time.  Furthermore, Counts
Six and Seven of the Complaint assert claims under federal
statutes.

from July 1997 to April 2002.  (<u>Id</u>., ¶ 2.)  Fulmer became an employee of defendant MB in May 2002.  (<u>Id</u>.)  He currently resides in Kingsville, Maryland.  (<u>Id</u>.)

Defendants Harvey and Paula Bennett reside in Maryland, are married and are principal stockholders, officers and directors of MBI.  (<u>Id</u>., ¶ 4.)

## II.  Procedural History

On May 4, 2004, Plaintiff filed a ten-count complaint[2] with this Court.  On May 5, 2004 Plaintiff brought an application for an order to show cause seeking a preliminary injunction against Defendants requesting that the Court enjoin and restrain Defendants from utilizing information contained in an allegedly wrongfully obtained, confidential customer list.  Plaintiff also requested that this Court issue an order preserving the computers allegedly used by Defendants to convert and meld Plaintiff's customer list into a new list.  On June 16, 2004, the Court for reasons stated in its opinion and order denied Plaintiff's motion for a preliminary injunction and vacated temporary restraints. <u>Greg Manning Auctions. Inc. v. Fulmer</u>, Civ. No. 04-2076, slip op.

_____

[2]    Plaintiff's counts include breach of contract (Count One), breach of fiduciary duty (Count Two), conspiracy to violate contractual and fiduciary obligations (Count Three), conversion (Count four), unfair competition (Count Five), irreparable damages (Count Six), violation of 18 U.S.C. § 1961 and 18 U.S.C. § 1962 (b)(c) and (d) (Count Seven), conspiracy to violate 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d) (Count Eight), violation of N.J.S.A. 2C:41-2(c) (Count Nine), and conspiracy to violate N.J.S.A. 2C:41-2(c) and N.J.S.A. 2C:41-2(d) (Count Ten).

at 11-14 (D.N.J. June 16, 2004).

Subsequently, on November 4, 2004, Defendants filed a motion to dismiss Plaintiff's complaint for improper venue and lack of personal jurisdiction or alternatively, to transfer this matter to the District of Maryland.  Following oral argument of the motion in December 2004 and pursuant to this Court's directive, the parties commenced discovery on the venue and jurisdiction issues.

## III. Factual Background

Plaintiff GMA has been in the business of auctioning, selling and purchasing stamps since the 1960's. (Compl., ¶ 10). Defendant MB has been one of approximately five principal competitors of GMA for several years. (Id., ¶ 12).  Both companies compete with each other to attract merchandise for auction and potential bidders to their auctions. (Id., ¶¶ 13-14).

For years GMA has continually developed a customer list which it considers its most valuable asset. (Id., ¶ 15; Manning Cert., ¶ 3).  Plaintiff claims that the list is worth in excess of $2,000,000.00. (Manning Cert., ¶ 4).  Plaintiff contends that the customer list is a trade secret because it contains information about its customers that is not available from outside sources. (Compl., ¶ 16).  Specifically, Plaintiff claims that the names, addresses and credit reports of its customers

-4-

cannot be found in the public domain.  (Id.)  Additionally, Plaintiff proffers that the alleged wrongfully obtained customer list contains information identifying the customers who provide the highest volume of business and who purchase the greatest amount of stamps.  (Manning Second Cert., ¶ 8).  Plaintiff contends that the above information was allegedly obtained by Defendants through misappropriation for the purpose of engaging in unfair competition.  (Pl.'s Br. at 9).

Defendant Fulmer was employed by GMA for approximately five years and had access to the alleged confidential customer list. (Compl., ¶ 19).  Plaintiff asserts that during his employment Fulmer agreed to abide by the provisions of GMA's employee handbook.  (Id., ¶¶ 20-22; Compl., Ex. B).  The employee handbook included a provision that any confidential information acquired during the course of employment would not be used for personal gain or the benefit of a third party.  (Id.,. ¶¶ 21-22; Compl., Ex. B).  The acknowledgment of receipt of GMA's employee handbook signed by defendant Fulmer, however, states that the handbook is neither a contract nor a legally binding document.[3]  (Compl., Ex.

---

[3]    The Court notes that the precise language used in the signed acknowledgment receipt of GMA's employee handbook states:

> I understand that the handbook is neither a contract of employment nor a legal document and nothing in the handbook creates an express or implied contract of employment or a guarantee or promise of any kind....  I understand that during the course of my

A).

GMA claims that most employees were provided access to its computer system because the access was necessary. (Manning Second Cert., ¶ 4). GMA further asserts that Fulmer was required to return to plaintiff any computer system information obtained during his employment upon leaving his position, pursuant to the Employee Handbook. (Id.) In addition, GMA claims that when Fulmer left GMA to work for MBI he copied the customer list and delivered it to MBI. (Id., ¶ 24). GMA alleges that Fulmer engaged in wrongful and tortious conduct in assisting with the melding of GMA's and MBI's customer lists. (Id., ¶ 27). GMA claims that approximately 30% of its customers were added to Defendant MBI's customer list. (Manning Second Cert., ¶ 13). Plaintiff further asserts that the "Additional Names" added to MBI's list are "select buyers" who buy from GMA due to "good relations" developed throughout years in business. (See id., ¶ 12).

Beverly Banner ("Banner"), a current employee of GMA who was previously employed by MBI, informed GMA of the alleged improper conduct of Fulmer and the Bennetts. (Banner Cert., ¶¶ 5-12).

_____

                  employment, confidential and proprietary information will be made available to me. I agree to abide by all policies in the handbook concerning such information.

(Compl., Ex. A).

Banner claims that the Bennetts requested that she compare MBI's customer list with GMA's customer list and make recommendations of what names should be added to MB's list. (<u>Id</u>., ¶ 8).  Banner made comments and notes on the GMA list and then gave it to Fulmer and the Bennetts.  (Banner Cert., ¶ 9; Compl., Ex. C). Banner also claims that she later observed Paula Bennett's "niece," Kim, consolidating the MBI and GMA lists.  (Banner Cert., ¶ 10).  Furthermore, GMA alleges that Fulmer used his personal computer to work on the new list and MBI used its own computer system to prepare the new list.  (Banner Cert., ¶ 12). Banner alleges that the purpose for consolidating the lists was to enlarge MBI's list for advertising, sales and solicitations. (<u>Id</u>., ¶ 11).

Defendant Fulmer, however, denies Banner's allegations and claims that while employed by GMA he observed a lack of safeguards and precautions to maintain the alleged secrecy of its customer lists.  (Fulmer Aff., ¶ 3).  Specifically, Fulmer claims that virtually every one of GMA's employees who had access to the general computer system had access to the customer list.  (<u>Id</u>.) In addition, Fulmer claims that GMA did not require employees to have a computer password to access the customer list.  (<u>Id</u>.) Fulmer also claims that he accessed GMA's computer system from his home and did not sign a confidentiality agreement regarding the information stored on GMA's computer system.  (<u>Id</u>., ¶ 4).

-7-

Fulmer alleges that while working for MBI it received from GMA an unsolicited group e-mail which included the e-mail addresses of all other recipients. (Id., ¶ 5). Fulmer claims that he assumed the other recipients of the e-mail were GMA's customers and he was able to identify many of the recipients who were already a part of MBI's customer list. (Id.) Fulmer further claims that more than 80% of those on GMA's customer list were major or common stamp collection buyers known to auction companies within the industry. (See id., ¶ 6).

Fulmer asserts that there were only two transactions made between MBI and the "Additional Names" found on GMA's customer list. (Id.) Fulmer alleges that these two transactions amounted to less than $13,000 in gross profit for MBI. (Id.) Fulmer claims, however, that these two transactions would have occurred regardless of whether these Additional Names were added to MBI's customer list due to the alleged coincidental personal relationship and referral of these two customers to MBI. (See id.) Additionally, Fulmer claims that prospective customers may bid on stamps on the internet through e-Bay Live Auctions, which makes it possible for several or all of the Additional Names of GMA's list to do business with MBI. (Id., ¶ 7).

Plaintiff asserts that on approximately February 25, 2004, GMA's attorneys requested that MBI take "certain action" with regard to the customer list, but MBI failed to address the

problem adequately.  (Compl., ¶¶ 29-32).  GMA claims that MBI continues to utilize the customer list and trade secrets obtained through Fulmer's alleged misconduct.  (Id., ¶ 33).  GMA further claims that MBI's alleged misconduct will continue to cause substantial damages through unfair competition.  (Manning Cert., ¶ 8).

### DISCUSSION

**I.   Personal Jurisdiction**

A.   Standard of Law Applied to Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)

Defendants ask this Court to dismiss the claims against them for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2).  Where a defendant challenges a court's exercise of personal jurisdiction, the burden is on the plaintiff to make a prima facie showing of jurisdiction.  See Mellon Bank (East) PSFS Nat. Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992); Time Share Vacation v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984).  To meet this burden, the plaintiff must establish "with reasonable particularity, sufficient contacts between the defendant and the forum state."  Id. (citing Provident Nat'l Bank v. California Fed. Sav. and Loan Assoc., 819 F.2d 434 (3d Cir. 1987)).  When deciding whether to dismiss a case for lack of personal jurisdiction, the court must accept as true the allegations in the complaint and resolve disputed issues of fact in favor of the plaintiff.  See Carteret Savs. Bank v.

Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992) cert. denied, 506 U.S. 817, 113 S.Ct. 61, 121 L. Ed. 2d 29 (1992).

Furthermore, a federal court has jurisdiction over a non-resident defendant to the extent authorized by the law of the state in which that court sits.  Fed. R. Civ. P. 4(e); North Penn. Gas Co. v. Corning Natural Gas Corp., 897 F.2d 687, 689 (3d Cir. 1990).  Accordingly, federal courts sitting in New Jersey apply New Jersey law when interpreting the meaning of due process for the purpose of personal jurisdiction.  Eason v. Linden Avionics, Inc., 706 F. Supp. 311, 319 (D.N.J. 1989).

The New Jersey long arm statute permits out-of-state service as far as is constitutionally permissible under the fourteenth amendment.  N.J. Court Rule 4:4-4; DeJames v. Magnificence Carriers, 654 F. 2d 280, 284 (3d Cir. 1981), cert. denied, 454 U.S. 1085 (1981).  Under the fourteenth amendment, personal jurisdiction exists where the plaintiff demonstrates the defendant has sufficient minimum contacts with the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985).

What constitutes minimum contacts varies with the "quality and nature of the defendant's activity."  Burke v. Quartey, 969 F. Supp. 921, 924 (D.N.J. 1997) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  The plaintiff may demonstrate that the court has general jurisdiction by showing that the defendant has continuous and systematic contacts with the forum or specific

jurisdiction by showing that the cause of action arose out of defendant's activities within or directed towards the forum state. See Helicopertos Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984). Whether asserting that the court has specific or general jurisdiction, the plaintiff must establish that the defendant's contacts with the forum are such that the defendant could "reasonably anticipate being haled into court there." Worldwide Volkswagon Corp. v. Woodson, 444 U.S. 286, 292 (1980). These contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." Hanson, 357 U.S. at 253. The absence of a physical presence in the forum state is not determinative as long as the facts demonstrate purposeful availment by the defendant of the laws of the state. North Penn. Gas Co., 897 F.2d at 691.

GMA bears the burden of demonstrating that Defendants Fulmer, MBI and the Bennetts' contacts with this state are sufficient to give this Court in personam jurisdiction. GMA must demonstrate that either this cause of action arose from Defendants' activities within New Jersey (specific jurisdiction) or their continuous and systematic contacts with New Jersey (general jurisdiction).

**1.  Specific Jurisdiction**

The Court considers first whether there is specific jurisdiction over MBI, Fulmer and the Bennetts.  For a court to properly exercise specific personal jurisdiction, the litigation must arise out of in-forum activities or activities directed toward the forum, and "it is essential . . . that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [State], thus invoking the benefits and protection of its laws." <u>Covenant Bank for Savs. v. Cohen</u>, 806 F. Supp. 52, 56 (D.N.J. 1992)(quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)).  A court must also consider whether exercising jurisdiction over the defendant would violate traditional notions of "fair play and substantial justice."  <u>Int'l Shoe Co. v. State of Wash., etc.</u>, 326 U.S. 310 (1945).  A court may not exercise jurisdiction in such a way as to make litigation "so gravely difficult and inconvenient that a party is at a severe disadvantage to his opponent." <u>Burger King Corp.</u>, 471 U.S. at 478.  "[D]ue process is satisfied when a forum asserts jurisdiction over a defendant who undertakes affirmative acts which the defendant should reasonably foresee would lead to economic damages within the forum." <u>Covenant Bank</u>, 806 F. Supp. at 56.

**A.   Specific Jurisdiction over MBI**

Defendant MBI is subject to the specific jurisdiction of this Court.  The evidence indicates that MBI knew that the

information on the customer database in question belonged to GMA
and took affirmative steps to incorporate contents of the
customer database to their own database.  By melding GMA's
customer database with their own MBI enhanced its ability to
identify and target new clients, particularly potential clients
in New Jersey.  As a result, substantial of GMA's New Jersey
business interests were impaired by MBI's actions and these
results could have been foreseen by MBI.

**B.    Specific Jurisdiction Over Fulmer**

     Defendant Fulmer is also subject to the specific
jurisdiction of this Court.  Fulmer had access to GMA's customer
database while residing in New Jersey and working at GMA's
corporate headquarters.  Moreover, Fulmer's experience in the
stamp collection business made him aware that GMA's customer
database would provide MBI with an unfair ability to compete with
GMA.  In addition, Fulmer's signature of GMA's Employee Handbook
Acknowledgment, while residing and working in New Jersey,
indicates his awareness that providing MBI with the customer
database would result in a violation of GMA's policies.
Furthermore, GMA employed Fulmer until April 2002 when Fulmer
left his position with GMA and immediately began working for MBI
in a similar position during the same month.  It can be
reasonably inferred that at least one reason MBI recruited Fulmer
was to have an experienced employee who would provide the company

-13-

with internal information regarding a competitor's business operations and customer information.

Further, the "accidental" e-mail Fulmer received from GMA allegedly did not contain GMA's customers addresses, telephone numbers, credit history or any other information.  (<u>See</u> Certification of Yale I. Lazris, Esq. ("Lazris Cert.") at Ex. H, Boisclair Dep. 32:15-23.)  Fulmer, however, informed the Bennetts that he possessed additional information regarding GMA's customers obtained during his employment with GMA in New Jersey. (<u>See</u> <u>id.</u> at Ex. E, P. Bennett Dep. 21:8-15-22:10.)  In response, the Bennets directed Fulmer to add GMA's customer names from the e-mail to MBI's customer list and mail the "additional" customers copies of MBI's large lot auction catalogs.  (<u>See</u> <u>id.</u> at Ex. E., P. Bennett Dep. 30:16-31:2.)  Therefore, Fulmer's intentional conduct of obtaining and not returning GMA's customer database while residing and working in New Jersey is sufficient contact to confer specific jurisdiction.

**C.   <u>Specific Jurisdiction Over the Bennetts</u>**

In addition, this Court has specific jurisdiction over the Bennetts.  Paula Bennett admitted that she recognized that the customers on the GMA e-mail were large lot stamp auction customers and directed Fulmer to mail GMA's customers copies of MBI's large lot auction catalogs.  (<u>See</u> <u>id.</u> at Ex. E, P. Bennett Dep. 21:8-22:10; 30:16-31:2.)  The record demonstrates that

-14-

Harvey and Paula Bennett knew that the customer database belonged to GMA and made affirmative steps to incorporate and convert the content of the database.  Specifically, the Bennetts directed Fulmer and Banner to incorporate GMA's customer database into MBI's own database.  Consequently, the Bennetts actions caused GMA to experience damages or losses of customer in New Jersey and other states.

## 2.   General Jurisdiction

The Court next addresses whether MBI is subject to general jurisdiction.  An exercise of general jurisdiction is consistent with due process only when the plaintiff has satisfied the burden of establishing that the defendant's contacts are continuous and substantial.  See Giangola v. Walt Disney World Co., 753 F. Supp. 148, 154 (D.N.J. 1990); Exton v. Our Farm, Inc., 943 F. Supp. 432, 437 (D.N.J 1996).  Such continuous and substantial contacts with the forum will allow a court to exercise general jurisdiction over the defendant even where the underlying cause of action is not specifically related to defendant's contacts. See Int'l Shoe Co. v. State of Wash., etc., 326 U.S. 310 (1945).

## A.   General Jurisdiction Over MBI

MBI is subject to general jurisdiction.  The record reveals that MBI (1) employed at least one individual, Leslie M. Boisclair ("Boisclair"), in New Jersey (Certification of Leslie M. Boisclair ("Boisclair Cert.") at ¶ 5.); (2) has a sufficient

stamp auction customer base in New Jersey (Certification of Yale I. Lazris, Esq. ("Lazris Cert.") at Ex. A, C, & G); (3) actively solicits customers in New Jersey through personal contact, journal advertisements and unsolicited mailings of auction catalogues (Lazris Cert., Ex. C & G); and (4) has received a financial benefit from conducting business in New Jersey between December 2002 and February 2005 (Lazris Cert., Ex. I).

Particularly, the evidence indicates that MBI has participated in actions in furtherance of its business interest in New Jersey.  For example, MBI employees have traveled to New Jersey between January 2001 and February 2005 to meet with customers, inspect collections and consignments and solicit new business.[4]  (Lazris Cert., Ex. G at Interrog. No. 7.)  In addition, MBI mails its auction catalogues to New Jersey, among

---

[4]     On January 10, 2001, George Eveleth, former Senior Vice President, traveled to New Jersey on behalf of MBI to review a stamp collection.  (Lazris Cert., Ex. G at Interrog. No. 7.)  On August 14, 2002, Jessica Bennett, Administrator, traveled to Atlantic City, New Jersey on behalf of MBI to attend the American Philatelic Society stamp show.  (Id. at Ex. G, MBI Interrog. Answer No. 7.)  On January 10, 2003, William Bergstrom, Philatelist/Describer, traveled to New Jersey on behalf of MBI to review a stamp collection.  On January 14, 2003, William Bergstrom, Philatlist/Describer, traveled to New Jersey on behalf of MBI to review a stamp collection.  (Id.)  In July 2003, Gerald Kline, Catalogue Production Associate, traveled to New Jersey on behalf of MBI to pick up a consignment.  (Id.)  On February 9, 2003, Jeffrey Schneider, Senior Vice President of MBI, traveled to New Jersey on behalf of MBI to review a stamp collection.  (Id.) (Id.)  On February 1, 2005, John DeStafanis, Philatelist/Describer, received material from a cosignor located in New Jersey.  (Id.)

-16-

other states, to solicit customers for its stamp auctions.  (Id.
at Ex. C, H. Bennett Dep. 61:3-5.)  Moreover, from December 2002
through February 2005, MBI's stamp auctions sales totaled
approximately $37,453,842.00 representing 4,465 buyers.  (See id.
at Ex. C, H. Bennett Dep. 61:10-16.).  Approximately 312 of the
4,465 buyers (7%) are located in New Jersey and their purchases
totaled $2,043,905.00.  (See id.)  New Jersey buyers account for
approximately 5.5% of MBI's auction sales for the period of
December 2002 through February 2005.  (See id.)  Accordingly,
given the benefits that MBI received for conducting business in
New Jersey it is not unreasonable for MBI to anticipate being
subject to the general jurisdiction of this Court.

## II.  Proper Venue

Section 1391(b) of Title 28 of the United States Code
provides that venue is proper in a case not based solely on
diversity of citizenship, in the District (1) where all
defendants reside, (2) where a substantial part of the events
giving rise to the claim occurred, or (3) where any defendant may
be found if no other venue is proper.  28 U.S.C. § 1391(b).  "The
statute only requires a "substantial part" of the events to have
occurred in the district to establish venue."  Park Inn Int'l,
L.L.C., v. Mody Enters., Inc., 105 F. Supp. 2d 370, 376 (D.N.J.
2000).  The statute does not require that the majority of the
events must take place in the district or that the challenged

-17-

forum be the best forum for the lawsuit.  Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994).  Those issues may be relevant to whether a transfer of venue should be granted.  See 28 U.S.C. § 1404(a).  However, "[t]hey are not dispositive of the issue of proper venue in the first instance." Park Inn, 105 F. Supp. 2d at 376.  The "substantial part of the events" standard "is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute."  Cottman, 36 F.3d at 294.  In determining where a substantial part of the events or omissions giving rise to a claim arises for the purpose of Section 1391, three factors are relevant: (1) the place of injury; (2) the "weight of contacts;" and (3) whether a substantial part of the events or omissions giving rise to the claim occurred in the district.  Eason v. Linden Avionics, Inc., 706 F. Supp. 311, 329 (D.N.J. 1989).

"[T]he choice of forum by a plaintiff is a 'paramount concern' in deciding a motion to transfer venue."  Tishio v. Bontex, Inc., 16 F. Supp. 2d 511, 521 (D.N.J. 1998) (citing Ricoh Co. Ltd. v. Honeywell, Inc., 817 F. Supp. 473, 490 (D.N.J. 1993). Title 28 U.S.C. § 1404(a) authorizes the district court to transfer a case to any other district where venue is proper "[f]or the convenience of parties and witnesses, in the interest of justice . . . ."  The burden is on the moving parties to show

-18-

that the proposed alternative forum "is not only adequate, but also more convenient than the present forum." <u>Ricoh</u>, 817 F. Supp. at 480.  Furthermore, "unless the balance is strongly tipped in favor of the defendant, the plaintiff's choice of forum should not be disturbed." <u>Gulf Oil Corp. V. Gilbert</u>, 330 U.S. 501, 508 (1947); <u>see also Ricoh</u>, 817 F. Supp. at 480.  Thus, the decision whether to transfer is in the sound discretion of the trial court.  <u>Cadapult</u>, 98 F. Supp. 2d at 564.

In exercising that discretion, the courts must consider factors relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice.  <u>Id.</u> (citing <u>Jumara</u>, 55 F.3d at 879-80).  In <u>Jumara</u>, the Third Circuit enumerated both the private and public interests protected by 28 U.S.C. § 1404(a).  Private interests include (1) the plaintiff's forum preference, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, and (6) the location of books and records limited to the extent that the files could not be produced in the alternative forum.  <u>Jumara</u>, 55 F.3d at 879.  Public interests include (1) the enforceability of the judgment, (2) practical considerations that could make the trial

easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, (5) the public policies of the forum, and (6) the familiarity of the trial judge with the applicable state law in diversity cases.  Id. at 879-80.

        In the instant matter, Defendants' motion to transfer venue is based upon their assertion that "Maryland is the district where all of the defendants reside, where the documents plaintiffs will seek in discovery are located and the place from where the actions leading to plaintiff's only claim for damage occurred." (Defs.' Br. at 5.)  GMA's claims against Defendants, however, arose from the alleged theft committed by Fulmer when he resided and worked in New Jersey and resulted in harm to Plaintiff's business interests in New Jersey.  Additionally, GMA's choice of its home forum does not demonstrate any difficulty (financial or otherwise) that Defendants may encounter by litigating GMA's claims in this Court rather than in nearby Maryland.  As such, both the private and public interests considered by the Jumara Court weigh in favor of GMA.

        Nonetheless, Defendants cite Tischio v. Bontex, Inc. to support their argument that venue should be transferred to Maryland.  The plaintiff in Tischio, a resident of Connecticut, brought suit in the District of New Jersey; therefore this Court

gave less deference to the plaintiff's choice of forum.  That
plaintiff claimed, <u>inter alia</u>, that she had a lifetime employment
contract with the defendant which had its corporate headquarters
in Virginia.  <u>Tischio v. Bontex, Inc.</u> 16 F. Supp. 511, 515.  The
<u>Tischio</u> Court reasoned that the complaint demonstrated that the
events giving rise to the action occurred predominantly in
Virginia and not in New Jersey.  <u>Id.</u> at 531.  Specifically, the
court relied on the fact that the decision to close the New
Jersey facility where the plaintiff worked took place at a board
of directors meeting in Virginia.  <u>Id.</u>  The court further
articulated that "the complaint failed to assert what actionable
decisions and/or conduct by the Defendants were made in New
Jersey."  <u>Id.</u>  Ultimately, the court concluded that because the
defendants demonstrated that the "operative facts of the lawsuit"
occurred in Virginia and not New Jersey, plaintiff's choice of
forum for the litigation was entitled to less deference.  <u>Id.</u>

     <u>Tischio</u>, however, is distinguishable from the case at bar.
In this matter, the central cause of action centers around
whether GMA's customer list, which it claims is a trade secret,
was improperly used by Defendants.  Specifically, GMA alleges
that Defendants' action of melding GMA's list into MBI's pre-
existing customer list and thereafter soliciting the additional
names from GMA's list is the result of Fulmer's taking of that
list.  This alleged improper conduct by Defendants occurred in

Maryland, where MBI's headquarters are located, but began in New Jersey when Fulmer had access to GMA's customer list.  GMA posits that venue is proper in New Jersey as to all Defendants because the Bennetts conspired to steal GMA's customer list while Fulmer worked for GMA in New Jersey prior to April 2002 and simultaneously persuaded him to join MB.

Particularly, GMA argues that Fulmer's removal of GMA's customer list from its New Jersey offices is the substantial part of the events that give rise to this litigation.  This assertion differs from the facts in <u>Tischio</u>, because GMA's corporate headquarters are located in New Jersey and Fulmer's action are the catalyst for GMA's claims.  Specifically, the New Jersey based alleged "theft" of GMA's customer list by Fulmer is the substantial event that gives rise to GMA's claims against all Defendants.

Defendants' proffer that all the critical and substantial events giving rise to this action took place in Maryland. According to Banner it was not until spring 2003 that Fulmer and the Bennetts first "discussed the Manning customer list which Fulmer indicated that he had printed out."  (Benner Cert. ¶ 5.) Moreover, this alleged discussion took place a year after Fulmer's employment with GMA in New Jersey had ceased. Accordingly, Defendants posit that the Bennetts could not have conspired with Fulmer to misappropriate GMA's customer list from

-22-

New Jersey prior to April 2002 because they did not know that Fulmer had a copy of the list until a year later in Maryland.

In addition, Defendants argue that GMA's complaint does not contend that Fulmer stole GMA's customer list and there is no cause of action that seeks damages based on the physical removal of the customer list from GMA's New Jersey offices. Defendants contend that GMA's complaint focuses on Defendants' alleged inappropriate use of GMA's customer list without authority, melding it into MB's customer list and soliciting the additional names from GMA's list. Defendants therefore argue that the alleged inappropriate use of GMA's customer list by MB, if true, can logically be presumed to have occurred in Maryland where MB's headquarters is located and where all Defendants resided and worked at the time that this alleged conduct took place.

Furthermore, the sixth count of GMA's complaint seeks a permanent injunction. This injunction includes the production of a host of customer, or customer list related, information from Defendants and the opportunity "to inspect the computers of the Defendants and each of them." (Compl. ¶ 56(H).) Defendants argue that this would be an inconvenience because all of Defendants' computers, property and documents requested by Plaintiff are located in Maryland and not in New Jersey.

Plaintiff also asserts that Defendants alleged inappropriate actions led to an economic injury in New Jersey, where Plaintiff

maintains its corporate headquarters, and that this injury supports venue in this Court.  In essence, Plaintiff's argument is that the Court can find venue solely because Plaintiff was injured in New Jersey by Defendants' alleged actions.  Defendants claim that this contention overstates the breadth of the law of venue.  In this matter, when Plaintiff speaks of the harm caused by the alleged business tort, it means solely the place where the economic effect of the tort was felt.  However, a plaintiff's physical or economic injury in its home state is not by itself a sufficient basis for venue there.[5]  Thus, Defendants claim that the mere fact that GMA may have suffered damages in New Jersey does not mean that its claims arose in New Jersey.  See Abramoff v. Shake Consulting, L.L.C., 288 F. Supp. 2d 1, 5 (D.D.C. 2003) (noting that while a plaintiff may feel damages in the district, that does not create venue under section 1391(a)(2)).

Despite these assertions, however, the Court finds that Fulmer's alleged theft of GMA's customer list during his employment by GMA, in its New Jersey office, is the substantial event that gives rise to GMA's claims against all Defendants. Fulmer signed an acknowledgment that he reviewed a copy of GMA's

---

[5]   "If this were enough to confer venue, then the plaintiff's residence would always be a proper venue in tort cases, or at least in cases of business torts.  But this is conspicuously not what Congress has provided in § 1391(a)."  Astor Holdings, Inc. v. Roski, 2002 U.S. Dist. LEXIS 758, at 23-24 (S.D.N.Y. Jan. 15, 2002).

Employee Handbook, which specifically prohibited disclosure of GMA's confidential and propriety customer information.  (Manning Cert. at ¶¶ 20-21.)  Further, GMA's customer information was maintained on GMA's computers, to which Fulmer had access.  He also had permission to copy this material onto his home computer for his convenience.  (Manning Cert. at ¶ 13.)  In addition, Fulmer admits that he accessed GMA's customer information by utilizing GMA's computer in New Jersey.  (Ex. A, Fulmer Dep. at 38:3-40:9; 40:10-41:18; 42:5-43:23.)  Although Fulmer received permission to copy GMA's computer system, which contained its customer list, onto his home computer to work from home, there is no evidence that he received the authority or approval to copy and distribute the customer list once his employment expired. (<u>See</u> Boisclair Cert. at ¶ 4.)  Moreover, it is undisputed that MBI incorporated the GMA customer list information into its own customer database and sent GMA's customers copies of MBI's auction catalogs.  Accordingly, it appears that a substantial part of the events or omissions giving rise to GMA's claims against all Defendants did occur in the District of New Jersey.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendants' motions to dismiss this action on grounds of lack of <u>in personam</u> jurisdiction or proper venue, and their alternative motion to transfer this matter to the U.S. District Court for the District of Maryland is denied.


/s/    John W. Bissell
                    JOHN W. BISSELL
                      Chief Judge
           United States District Court


DATED:  August 23, 2005

-26-